UNITED STATES of America

v.

Riley S. WALLS, et al., Defendants.

Crim. No. 92–0234–LFO.

United States District Court,
District of Columbia.

Jan. 26, 1994.

As Amended Feb. 4, 1994.

John Horan, Asst. U.S. Atty., Washington, DC, for U.S.

Richard S. Stern, Washington, DC, for Riley Walls.

Peter M. Brody, Ropes & Gray, Washington, DC, amicus for Walls & Jackson.

Grandison Ernest Hill, Hill & Associates, Washington, DC, for Jerome A. Jackson.

Abbe Jolles, Washington, DC, for Karen M. Blakney.

Bruce A. Baird, Michele J. Woods, Covington & Burling, Washington, DC, amici for Blakney.

Charles Kubinski, Washington, DC, for Charles F. Campbell.

Philip T. Inglima, Cacheris & Treanor, Washington, DC, amicus for Campbell.

Nancy Hollander, Albuquerque, NM, Judy Clarke, Spokane, WA, Amicus Brief of the Nat. Assn. of Criminal Defense Lawyers.

*MEMORANDUM ON SENTENCING*

OBERDORFER, District Judge.

At issue here is whether the difference between the mandatory minimum sentences these defendants face after cooking or causing powder cocaine to be cooked into crack cocaine before they sold it and the lesser sentences they would have faced if they had delivered cocaine in powder form violates the Equal Protection Clause of the Constitution or the Eighth Amendment's prohibition of cruel and unusual punishment.

### I.

A jury convicted defendants on a multi-count indictment charging conspiracy and several counts of distribution of at least 50 grams of crack cocaine. The charges arose out of four separate sales to two undercover agents of the Drug Enforcement Administration between May and September of 1991. Defendants Riley Walls and Jerome Jackson made the sales. They initially delivered powder cocaine, but during the first transaction the agents specifically demanded that the powder cocaine be converted into crack. Agent Mark Ross testified at trial that the agents insisted on crack because they knew that crack carried heavier sentences than powder cocaine. *See* Trial Transcript (Nov. 25, 1992), at 50. None of the cocaine at issue in this case was sold to actual or potential users.

Walls has 15 prior criminal convictions, while Jackson has four drug convictions—three involving distribution—and an attempted prison breach. Walls is 45 years old, and Jackson is 38 years old. Walls and Jackson employed defendants Karen Blakney and Charles Campbell to perform the conversion by the simple process known in the trade as cooking. Both Blakney and Campbell are addicted to narcotics. Blakney was paid $100 by a DEA agent; Campbell's compensation was "a little piece . . . of crack cocaine." Trial Transcript (Nov. 23, 1992) at 48. In contrast to the records of Walls and Jackson, Blakney's criminal history consists of convictions for shoplifting in 1986, contempt of court for failure to appear for a court hearing in 1987, attempted possession of cocaine in 1988, a violation of the Bail Reform Act in 1988, and another violation of the conditions of her bail in that same year. Campbell has two prior felony convictions, both involving drug distribution.

The conspiracy of which defendants stand convicted involved distribution of 538 grams of crack cocaine. Distribution of any amount over 50 grams of crack is sufficient to trigger the statutory minimum sentences. Had this case involved distribution of the same amount of powder cocaine, rather than crack, the statutory minimums would not have come into play, because only distribution of at least 5000 grams of powder cocaine triggers the minimums. Thus, defendants Walls and Jackson face mandatory sentences of life imprisonment. Had this case involved powder cocaine, Walls would face a range under the Federal Sentencing Guidelines of 360 months to life; Jackson would face a range of 262 to 327 months. Defendant Blakney faces a mandatory sentence of 10 years. Had this case involved powder cocaine, Blakney would face a Guidelines range of 24 to 30 months.[1]

1. The government prosecuted Blakney for offenses involving 356.38 grams of crack, resulting in a sentencing range of 235 to 293 months. The probation office included this figure in its presentence investigation report. The range for 356.38 grams of powder cocaine would have been 77 to 96 months. On March 23, 1993, the probation office issued a memorandum suggesting a lower

Defendant Campbell faces a mandatory sentence of 20 years. Had this case involved powder cocaine, Campbell would face a Guidelines range of 27 to 33 months. In addition, Blakney and Campbell would be subject to up to six years of release under the supervision of this Court's Probation Office and to the risk of being returned to prison by the Court for violating any condition of probation.

## II.

In analyzing whether the crack-powder sentencing disparity denies constitutional equal protection to any of the defendants, the first necessary inquiry is whether the mandatory crack minimums, triggered by only one percent as much crack as the amount of powder cocaine required to trigger the same statutory minimum sentences, discriminate sufficiently based on race to necessitate a strict scrutiny analysis. Under such analysis, a statutory classification that discriminates based on race can only survive if the government demonstrates that the classification is "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982). In order to prove that a facially neutral statute violates the Equal Protection Clause, a challenger must demonstrate a racially discriminatory purpose behind the statute. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The challenger need not show that the statute rested exclusively on a racially discriminatory motivation. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). However, the statute violates equal protection only if it was enacted "because of, not merely in spite of" its discriminatory impact on a protected class. *Personnel Administrator v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

Our Court of Appeals has determined, despite the foregoing, that there is a rational basis for the difference in the sentences imposed on account of crack transactions and powder cocaine transactions. *United States v. Cyrus*, 890 F.2d 1245, 1249 (D.C.Cir.1989). However, it is not apparent that the Court of Appeals considered material produced by *amici* in this case with respect to the historical background and legislative history that culminated in the disparate punishment mandated by Congress for crack dealers and powder cocaine dealers.

In *Arlington Heights, supra,* the Supreme Court provided guidance about the "sensitive inquiry into such circumstantial and direct evidence of [discriminatory] intent as may be available" in examining a statute. *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 563. The Court identified several elements that tend to characterize intentionally discriminatory statutes. An initial factor is "[t]he impact of the official action—whether it 'bears more heavily on one race than another'" *Id.* (quoting *Washington v. Davis*, 426 U.S. at 242, 96 S.Ct. at 2048). Second, the Court suggested an examination of "[t]he historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes." *Id.*, 426 U.S. at 267, 96 S.Ct. at 2060. Third, the Court urged an inquiry into "[t]he specific sequence of events leading up to the challenged decision." *Id.* Fourth, the Court stressed the importance of "[d]epartures from the normal procedural [and substantive] sequence...." *Id.* Finally, the Court stated, "[t]he legislative or administrative history may be highly relevant...." *Id.*, 426 U.S. at 268, 96 S.Ct. at 2061.

## A.

*Amici*[2] have put forward a powerful argument that imposition of the same sentence on

---

range for Blakney, including the recommendation that she be held responsible for only 140.31 grams of cocaine. The Court included the original figures in its Memorandum on Sentencing, filed January 24, 1994. At the sentencing hearing on January 25, 1994, the government acquiesced in several of the downward adjustments suggested in the March 23 memorandum, including holding Blakney responsible for only 140.31 grams of cocaine.

2. Three different *amici* were appointed to assist in analyzing the constitutional issues in this case. They are Philip T. Inglima of Cacheris & Treanor for defendant Campbell; Bruce Baird and Michele Woods of Covington & Burling for defen-

a participant in a transaction involving 100 grams of powder cocaine and one involving one gram of crack violates the Equal Protection Clause. They point to expert opinion that there is no material difference between the inherent properties of powder and crack cocaine, or in their physical addictiveness. *See* Testimony of George Robert Schwartz, M.D., in *United States v. Maske,* Crim. No. 92–0132 (Feb. 17, 1993). Moreover, it is undisputed that, for example, for the year ending September 30, 1992, approximately 90 percent of those indicted for crimes related to crack cocaine were black, while only 3 percent were white; blacks constituted less than 30 percent of those convicted of crimes related to cocaine powder.

*Amici* have collected historical evidence that advocates of the Harrison Act of 1914, the very first federal law to police cocaine transactions, made a point of "[t]he association of cocaine with the Southern Negro." Musto, *The American Disease: Origins of Narcotic Control* 254 (1973). A more recent scholarly work reiterates that "drugs were associated with unpopular subgroups. As David Musto observes, 'Cocaine raised the specter of the wild Negro, opium the devious Chinese, morphine the tramps in the slums.'" Friedman, *Crime and Punishment in American History* 355 (1993). There is other historical evidence that, after the election of 1912, "for the first time since the Civil War the federal government had placed its approval on the Southern caste system." Link, *Woodrow Wilson and the Progressive Era 1910–1917* at 64–66 (1954). According to Musto, "[t]he association of cocaine with the Southern Negro became a cliche a decade or more before the Harrison Act." *The American Disease* at 254. The House Ways and Means Committee that reported out the Harrison Act quoted a 1910 report by Dr. Hamilton Wright to the International Opium Commission, which stated that "the cocaine vice ... has been a potent incentive in driving the humbler negroes all over the country to abnormal crimes." International Opium Commission, *Report of the International Opium Commission and on the Opium Problem as Seen Within the United States and Its Possessions* 51 (1910), *reprinted in* House Committee on Ways and Means, 63d Cong., 1st Sess., Report on H.R. 6282 (June 24, 1913) at 2. According to Musto, "[t]he purpose of Wright's strong statements in regard to cocaine and Negroes was, of course, to encourage the legislation ..., partly by motivating hesitant southern Democrats...." *The American Disease* at 44.

While much transpired in the world of drug law enforcement between the enactment of the Harrison Act and the mandatory minimum sentences enacted in the 1980s, it is judicially noticeable that it was not until the 1960s that many forms of racial discrimination were outlawed in the United States, and that racial tension relating to crime intensified by the time of the enactment of the 1986 sentencing laws. *Amici* found in the legislative history of the 1986 Act some embers of the discriminatory attitudes of early in the century and of the crime-related racial tensions of the 1980s in statements appearing in the legislative record of that Act. For example, a Florida sheriff testified before the Senate in support of the 1986 Act that "the seller we see is Haitian or black...." *"Crack" Cocaine: Hearing Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs,* United States Senate, 99th Cong., 2d Sess., at 58. Media accounts introduced into the Congressional Record included statements, which harked back to and thus connected with the Harrison Act era, that "[m]ost of the dealers, *as with past drug trends,* are black or Hispanic.... Whites rarely sell the cocaine rocks." 132 Cong.Rec. S4670 (daily ed. April 22, 1986) (emphasis added). The typical crack dealer was identified as "a big-shouldered Trinidadian wearing gold chains and a diamond-studded bracelet," 132 Cong. Rec. S7123–25 (daily ed. June 9, 1986), and drawn, in words recited by Sen. D'Amato on the Senate floor, from "the ghetto's legion of unemployed teenagers." 132 Cong.Rec. S809 (daily ed. June 20, 1986).

dant Blakney; and Peter M. Brody and Paul Noe of Ropes & Gray for defendants Walls and Jackson. Their efforts are greatly appreciated. The arguments attributed to *amici* in this section were advanced primarily by *amicus* for defendants Walls and Jackson.

Statements entered into the record implied that drug trafficking by black dealers was corrupting white users and communities, e.g., "There are ominous signs that crack and rock dealers are spreading well beyond the inner city." 132 Cong.Rec. S7123–25 (daily ed. June 9, 1986). "For the growing numbers of the white middle class who have become hooked on cocaine rock, buying the drug can be like stepping into a foreign culture." 132 Cong.Rec. S4672 (daily ed. April 22, 1986). Another media account introduced into the Congressional Record warned of "a Jamaican invasion in West Virginia":

> With its tidy clapboard houses and neat apple and peach orchards on land George Washington surveyed centuries ago, Martinsburg, W.Va. (population: 13,000) seems far from the mean streets normally patrolled by drug gangs. But over the last three years, an invasion of Jamaican drug dealers has turned the home of the Mountain State Apple Harvest Festival into a mecca for cocaine.

*Id.* at S2889.[3]

Possibly more probative is the evidence submitted by *amici* of the political climate on the eve of the enactment of the 1986 mandatory minimums and reflected in the legislative history. To meet *Arlington Heights'* interest in departures from normal legislative patterns, *amici* include an eyewitness account by Eric Sterling, then counsel to the House Subcommittee on Crime:

> The Controlled Substances Act sentencing provisions were initiated in the Subcommittee on Crime in early August 1986 in a climate in the Congress that some have characterized as frenzied. Speaker O'Neill returned from Boston after the July 4th district work period where he had been bombarded with constituent horror and outrage about the crack cocaine overdose death of NCAA basketball star Len Bias after signing with the championship Boston Celtics. The Speaker announced that the House Democrats would develop an omnibus anti-drug bill, easing the re-

election concerns of many Democratic members of the House, by ostensibly preempting the crime and drug issue from the Republicans who had used it very effectively in the 1984 election season. The Speaker set a deadline for the conclusion of all Committee work on this bill as the start of the August recess—five weeks away.

Hearings before the United States Sentencing Commission on Proposed Guideline Amendments for Public Comment, Testimony of Eric E. Sterling, President of the Criminal Justice Policy Foundation, at 2 (Mar. 22, 1993). *See also* David Shribman, *Fight Against Drug Abuse Illustrates the Limits of Politics As Legislative Solution Proves Elusive,* Wall St. J., June 20, 1986, *reprinted in* 132 Cong.Rec. S8092–93 (daily ed. June 20, 1986).

In further reference to departure from normal legislative procedure, *amici* also offered Sterling's observation that

> [t]he development of this omnibus bill was extraordinary. Typically Members introduce bills which are referred to a subcommittee, and hearings are held on the bills. Comment is invited from the Administration, the Judicial Conference, and organizations that have expertise on the issue. A markup is held on a bill, and amendments are offered to it. For this omnibus bill much of this procedure was dispensed with. The careful deliberative practices of the Congress were set aside for the drug bill.
>
> And unfortunately for the Democrats, their attempt to preempt the drug and crime issue was easily rebuffed by the Republicans who simply raised the stakes by offering amendments with longer sentences, in favor of the death penalty, for elimination of the exclusionary rule, and so forth.

Sterling Testimony at 2. As an example, according to Sterling,

> the 100:1 cocaine to crack ratio ... was originally a 50:1 ratio in the Crime Subcommittee's bill, H.R. 5394, and was arbi-

---

3. Similar code-worded observations appeared in the record of congressional consideration of the 1988 Act, e.g., "The ghetto gangs' entry into drug trafficking on a major scale may be creating the nation's biggest crime problem in decades." 134 Cong.Rec. S2887 (daily ed. Mar. 23, 1988).

trarily doubled simply to symbolize redoubled congressional seriousness.

*Id.* at 4. *Amici* make the additional point that the single Senate Committee hearing on 100:1 sentencing lasted about 3½ hours,[4] despite many Senators' objections to the speed under political pressure that characterized the Senate action. *See Amici* Exs. 17 and 25.

*Amici* argue further that the statute was unconstitutionally applied so as to violate equal protection. *Amici* present the fact that 91.5% of crack defendants nationwide are black, like all four defendants in this case, as evidence of a racially discriminatory animus in crack prosecutions. In addition, *amici* cite studies showing that the weight of mandatory minimum sentence provisions falls much more heavily on black defendants. *See, e.g.,* Federal Judicial Center, *The General Effect of Mandatory Minimum Prison Terms* at 20 (1992). The government responds that the evidence does not support a conclusion that these defendants were "singled out for prosecution among others similarly situated and that the decision was improperly motivated," i.e., by race. The government attributes the fact that over 90 percent of crack defendants in this district are black to the fact that 80 percent of the population is black, so that, in the circumstances, the statistical disparity in the race of crack defendants is explainable. *See Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 563.

The government response accepts, as it must, that, while the statutory scheme is neutral on its face, the *Arlington Heights* analysis is appropriate here. It does not accept the proposition that the statistical evidence offered by *amici* of the *disparate* impact of the statutory scheme evidence a *discriminatory* intent. According to the government:

the higher black conviction rate for crack offenses may be attributable to any number of factors, including the possibility that blacks are convicted of crack cocaine offenses at a higher rate because for various historical, economic and cultural reasons they tend to commit crack cocaine offenses

at a higher rate than they commit powder cocaine offenses.

Government's Opposition to Amici Curiaes' Sentencing Memoranda and to Defendants' Motion for Post–Trial Severance at 10 (Sept. 22, 1993). Moreover, the government argues, black offenders who distribute in open-air drug markets, which are common in low-income, predominately black, inner-city neighborhoods, are more easily caught through traditional law enforcement techniques than white offenders who live in the suburbs and conduct business in a more discreet manner. Because of those and other statistical flaws the government urges that the statistical evidence alone is "clearly insufficient to support an inference that any of the decision makers (Senators and Congressmen) acted with discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987).

As to the rationality of any discrepancy between crack and powder cocaine for the purpose of sentencing, the government points to evidence that, whether right or wrong, the decision makers stated a belief in the "growing availability of crack," which was "cheap, highly addictive and deadly." Sen. Com. Report, *supra,* at 4. It was thought to be "cheaper . . . and far more dangerous . . . [and] easier to transport and use." 132 Cong.Rec. S14282 (daily ed. Sept. 30, 1986).

The government virtually concedes that there is no material difference between the properties of crack and cocaine. However, it relies upon the statement of Dr. Robert Bych before the Senate Committee that the amount that can be inhaled at a particular time is virtually unlimited, it goes to the brain more rapidly, and, where cocaine is smoked or injected, the mood swings are more rapid so that the need for another dose comes more quickly. These circumstances, plus the fact a small but powerful dose is available on the market for $10 to $20 makes it possible for dealers to exploit profitably the larger market of less affluent customers.

The government dismisses *amici's* circumstantial evidence of a discriminatory legisla-

---

4. *"Crack" Cocaine: Hearings Before the Permanent Subcommittee on Investigations of the Com-* *mittee on Governmental Affairs,* United States Senate, 99th Cong.2d Sess. (July 15, 1986).

tive intent from the 80–year old Harrison Act history, the sparse Congressional Record references from 1986, and contemporaneous press accounts as speculative.

### B.

Although the disparity between the crack and powder penalties and the heavy impact of that disparity on black defendants is manifestly unfair, the record here, like that in *Arlington Heights*, does not provide a preponderance of evidence that the disparate impact "can be traced to a discriminatory purpose." *Personnel Administrator*, 442 U.S. at 272, 99 S.Ct. at 2293. The racial implications of the legislative history of the 1986 Act and its 1914 predecessor are too sparse, too tangential, or too remote in time to support a finding that a majority in Congress in 1986 intended the crack penalties to discriminate against blacks. For example, Speaker O'Neill's outrage over the death of Len Bias and the Boston Celtics' loss of him would be difficult to classify as racially motivated. Absent such a finding, the crack penalties are not subject to strict scrutiny. Moreover, our Court of Appeals has established Circuit law that the reasons that the government has given for the greater penalties for crack as opposed to powder cocaine offenses satisfy rational basis review, despite the apparent similarity between the two forms of the drug and the extreme concentration of crack convictions among the black population. *Cyrus, supra.* Accordingly, I cannot conclude that the mandatory crack penalties, on their face or as applied, violate the Equal Protection Clause.

### III.

The question remains whether imposition of life sentences on Walls and Jackson and confinement for 10 and 20 years of Blakney and Campbell, respectively, are impermissibly "cruel and unusual" within the meaning of the Eighth Amendment. The Supreme Court's plurality decision in *Harmelin v. Michigan*, —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), rejected an Eighth Amendment challenge to a life sentence without parole imposed by a state court for mere possession of 672 grams of powder cocaine.

The rationale of a majority of the *Harmelin* Court was not hospitable to extension to terms of imprisonment of the proportionality analysis employed in death cases. Also, our Court of Appeals has declined to apply that analysis to the sentencing distinction between crack and powder cocaine. *Cyrus*, 890 F.2d at 1248. However, the fact remains that the Court's death penalty jurisprudence tests death sentences under the Eighth Amendment, not only in terms of proportionality, but also, as stated by Justice White in *Furman v. Georgia*, 408 U.S. 238, 312, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346 (1972) (concurring opinion), in terms of whether the sentence was "justified by the social ends it was deemed to serve." Thus, the plurality in *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), read into the Eighth Amendment an "arbitrary and capricious" analysis. That case gave particular attention to "the uniqueness of the death penalty." *Id.* But the death penalty is not the only punishment that is, or could be, "unique."

Given the ages of Walls and Jackson, the difference between the mandatory life sentences Walls and Jackson face for dealing crack and the thirty- and twenty-year sentences, respectively, that they would face had their crimes involved cocaine powder, viewed in light of their egregious conduct, the large sums of money and amounts of drugs they sought to trade, and their serious criminal histories, is not so extreme as to be either cruel or "unusual." Thus, the government is correct in asserting that Walls' and Jackson's mandatory sentences do not violate the Eighth Amendment.

The absence of the same characteristics from the conduct of Blakney and Campbell, however, leads to the conclusion that the crack minimums are cruel and unusual as applied to those two defendants. Ordinarily, a judicial finding that a statute is unconstitutional "as applied" focuses on some form of prosecutorial misconduct. *See, e.g., Castaneda v. Pardita*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). In this case, examination of the constitutionality of the crack penalties as applied to defendants Blakney and Campbell may take into account the com-

bined actions of Congress, police and prosecutors, and the courts, which ultimately brought the penalties to bear upon them: The emanations from the racist origins of the Harrison Act, the racist implications arising from the public clamor in 1986 about crack in the inner city, and the haste in which Congress passed and enacted the enhanced mandatory penalty for any crime associated with a crack, as distinguished from powder, cocaine transaction.

More specifically, in *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the Supreme Court held that criminal punishment of a drug addict on account of his or her addiction is cruel and unusual.[5] In light of *Robinson*, the sentences of 10 years for Blakney and 20 years for Campbell, both of whom are drug addicts, are manifestly "cruel." Blakney and Campbell were bit players in the conspiracy. Their compensation was a pittance. Yet Blakney faces a mandatory sentence of 10 years, and Campbell faces a mandatory sentence of 20 years. If their conduct is considered part of a powder cocaine conspiracy, the guideline range for persons with their criminal history would be 24 to 30 months and 27 to 33 months, respectively. Thus, if sentenced for 140 grams of crack, Blakney would serve 8 additional years, or five times longer than if she were sentenced for the powder originally tendered to the undercover agents.[6] Campbell would serve an additional 17 years and 9 months, or nine times longer. They face these enhanced sentences because, as addicts feeding their habits, they cooked powder cocaine into crack for the profit of Walls and Jackson and for delivery, not to the public, but to undercover officers who had induced the conversion of the powder to crack in the first transaction.

This decision has not been taken without consideration of the fact that imposition of a 10–year sentence for possession with intent to distribute 50 grams or more of crack is, in one sense, "usual"; it is done with great frequency. However, *Furman, supra*, held cruel and unusual not the death penalty itself, but arbitrary and capricious application of that penalty. The Supreme Court found the application of the death penalty unconstitutional where it was "imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). The facts on this record, taken as a whole, demonstrate that application of the mandatory crack minimums to Blakney and Campbell is arbitrary and capricious, and therefore unusual. Whether the same analysis, or the same conclusion, will be appropriate to some of the many defendants who face these penalties remains for the courts that sentence them to determine.

Nor have these conclusions been reached without consideration of the fact that Blakney's and Campbell's role in the conspiracy consisted of converting powder cocaine into crack. It could be argued that, even if Walls and Jackson were originally engaged in selling powder cocaine, Blakney's and Campbell's role involved only crack. However, Blakney and Campbell were convicted of preparing for sale what was essentially cocaine, albeit in a different form from powder. The cocaine was provided by Walls and Jackson. In order to feed their addictions, Blakney and Campbell performed as bit players, primarily as "cookers," in the Walls and Jackson enterprise. The question for sentencing is whether, in light of all the circumstances in

---

**5.** Justice Stewart analogized criminal prosecution of addicts to

mak[ing] it a criminal offense for a person to be mentally ill, or a leper, or afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be· universally thought to be an inflic-

tion of cruel and unusual punishment in light of the Eighth and Fourteenth Amendments. *See State of Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459[, 67 S.Ct. 374, 91 L.Ed. 422 (1947)].

370 U.S. at 666, 82 S.Ct. at 1420.

**6.** Under the sentencing recommendations for 356.38 grams of cocaine, *see supra* note 1, Blakney's minimum crack sentence of 235 months was three times as long as her minimum powder sentence of 77 months.

this record, the addition of 8 years to Blakney's sentence and 17 years and 9 months to Campbell's sentence would be a cruel and unusual application of the statutory scheme for powder cocaine and crack, which evolved over the years in an atmosphere of discrimination,[7] ignores the underlying addiction that drove these defendants' behavior,[8] and, as applied, would, but for the Eighth Amendment, grossly distort the relationship between their conduct and the sanctions for it. Their particular ancillary role as cookers is a circumstance that would tend to support imposition of the heavier crack sentences. However, it does not trump the more significant circumstances that render the imposition of additional 8- and 17-year sentences cruel and unusual here.

In light of all the circumstances—the historical context of the relevant law, its legislative history, and these defendants' condition, conduct, and compensation—the imposition of additional sentences of 8 and 17 years on Blakney and Campbell would be not only cruel, but also "unusual," because their imposition would be arbitrary and capricious, *Gregg, supra*, and would provide "only marginal contributions to any discernible social or public purposes." *Furman*, 408 U.S. at 312, 92 S.Ct. at 2763 (White, J., concurring). Application of the heightened crack sentences to Blakney and Campbell would therefore violate the Eighth Amendment. Accordingly, Blakney and Campbell will be sentenced within the ranges prescribed for those who transact in powder cocaine: 24 to 30 months in the case of Blakney, and 27 to 33 months for Campbell. Upon release both will be under the supervision of the United States Probation Office of this Court for six years subject to special conditions that, among other things, each will participate in supervised drug surveillance and treatment and will be subject to being returned to prison by the Court for any violation of that, or any other, condition of release.

---

7. *Compare Arlington Heights, supra.*

8. *See Robinson v. California, supra.*