**UNITED STATES of America**

v.

**Sharon SHEPHERD a/k/a Sharon Ortega.**

**Cr. No. 94–0010–1 (HHG).**

United States District Court, District of Columbia.

July 20, 1994.

---

Bruce A. Pagel, Deputy Chief, Litigation and Julie J. Shemitz, Trial Atty., Narcotic and Dangerous Drug Section, U.S. Dept. of Justice, Washington, DC, for Government.

Bernard S. Grimm, Washington, DC, for defendant.

1. The term "guidelines" has long been a misnomer. Departures from the mandatory nature of the guidelines are reserved for exceptional cases and fact situations not foreseen by the Sentencing Commission. Few fact situations are not foreseen by the Commission, whose product resembles in its detail, complexity, and its mandatory nature, the Internal Revenue Code rather

*OPINION*

## HAROLD H. GREENE, District Judge.

This case demonstrates that, because of the mandatory minimum sentences and the rigid sentencing guidelines, effective control of sentencing—from time immemorial in common law countries a judicial function—has effectively slipped, at least in some cases, not only to the realm of the prosecution but even further to that of the police. This development denies due process and is intolerable in our Constitutional system.

### I

As explained in detail below, the statutory penalties established by Congress and the sentencing guidelines issued by the U.S. Sentencing Commission [1] mandate that, because a portion of the drugs sold in this case took the form of cocaine base (popularly known as crack), the defendant must receive for her drug offenses a sentence of 120–135 months. Yet, had all of the drugs sold remained in powder form, the defendant would receive a sentence for these offenses of only 60 months.[2] *See infra* part II. The evidence shows that on both occasions on which defendant was charged with distribution of crack, she was prepared to sell cocaine powder to an undercover law enforcement officer but, upon the officer's insistence that she first convert the powder to crack, she complied by "cooking" the powder in a microwave for a few minutes. The agent then purchased the cocaine in its converted state.

As described below, the agent's purpose in causing the conversion was to expose the defendant to the more severe crack sentence, that is, to double the time she must spend in the penitentiary for the drug offenses. Nevertheless, the government argued at the sentencing hearing that the Court is required to implement the agent's design by sentencing the defendant based on the crack penalty. The Court concludes that the confluence of the mandatory statutory minimum, the man-

than what would normally be understood by the term "guidelines."

2. In either event, the defendant's sentence must be augmented by a consecutive sixty-month sentence for carrying a firearm during and in relation to a drug trafficking crime. *See* 18 U.S.C. § 924(c)(1).

datory guidelines, and the actions of the government agent, if implemented, would lead to an unjust result such as to shock the conscience of the Court.[3]

This Court, and many other District Court judges throughout the nation, have often criticized the policy and effect of mandatory minimum sentences established by Congress and the rigid sentencing guidelines issued by the Sentencing Commission as being inimical to fairness and justice. The instant case exemplifies a feature of the guidelines that has not heretofore received much attention: the ability of police officers, in addition to the power of prosecutors, to manipulate these statutes and guidelines so as to achieve ends that may not be consistent with justice.

## II

The defendant appeared before the Court for sentencing following her conviction on each count of a five-count indictment.[4] These charges arose from one sale of 990.3 grams of cocaine powder, two sales of crack aggregating 221.6 grams, and the possession of a pistol during one of the transactions.[5] In addition, two alleged sales of drugs predating the aforementioned sales were not charged, but were nevertheless included in the presentence report as "relevant conduct." [6]

Defendant's presentence report, following the method established under the sentencing guidelines, converted both the cocaine powder and crack to their marijuana equivalent,[7] and pursuant to U.S.S.G. § 2D1.1(c)(5), this resulted in a calculated offense level of 34. After awarding a three-level reduction for acceptance of responsibility,[8] defendant would have been faced with an adjusted offense level of 31. In light of the defendant's

3. In this regard, the Court notes that " 'substantive due process' " prevents the government from engaging in conduct that 'shocks the conscience' ... or interferes with rights 'implicit in the concept of ordered liberty.' " *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (citing *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325–26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). See *infra* part V. *See also United States v. Jones*, 18 F.3d 1145, 1153 (4th Cir.1994).

4. The indictment included two counts of distribution of crack (counts 2 and 4), one count of distribution of cocaine powder (count 5), one count alleging a conspiracy to distribute or possess with intent to distribute drugs (count 1), and one count of carrying a firearm in relation to a drug trafficking crime (count 3). One co-defendant was convicted on two counts and acquitted on two others; another co-defendant was acquitted of all charges.

5. As previously noted, the firearms count (count 3) carries a mandatory five-year term which must be served consecutively to the terms imposed for the other counts. The punishment for that count is not in dispute.

6. Detailed evidence regarding these two alleged sales was not presented at trial or at the sentencing hearing, and the Court is therefore not fully aware of the circumstances surrounding the sales. However, because of the amount of drugs ultimately involved, the inclusion or exclusion of these two sales has no effect on the sentence imposed.

7. Pursuant to the Sentencing Commission's equivalency rules, the drugs in this case were assessed a fictitious equivalent of 5,717.50 kilograms of marijuana.

8. At the sentencing hearing, the government did not object to defendant's request for a three-level reduction for acceptance of responsibility. In any event, the Court finds that the reduction is warranted in this case.

Although the defendant did go to trial, this case presents one of the "rare situations" in which the reduction for acceptance of responsibility nevertheless is appropriate under the guidelines. Application Note 2 to U.S.S.G. § 3E1.1 provides in relevant part that:

Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt.

In this case, the defendant has never contested her involvement in the crimes at issue. In fact, she admitted her criminal involvement in statements provided to DEA agents shortly after her arrest. Moreover, she has continued to show recognition for her criminal conduct in her post-trial interviews with the probation officer assigned to her case. However, as the following discussion demonstrates, she was forced to go to trial in order to preserve and expose issues unrelated to factual guilt. This is precisely the situation anticipated by the guidelines.

lack of any prior criminal history points,[9] this would have resulted in a sentence range of 108–135 months. That range would then have to be adjusted to 120–135 months based upon the statutory minimum penalty for distribution of 50 grams or more of crack. *See* 21 U.S.C. § 841(b)(1)(A).

By comparison, had the defendant's offense level been calculated as if all the sales had been of cocaine powder, the total of 1,267.438 grams of powder would have resulted in an offense level of only 26. U.S.S.G. § 2D1.1(c)(9). After award of the aforementioned three-level reduction for acceptance of responsibility, the offense level would be reduced to 23. This, in turn, would result, pursuant to the guidelines, in a sentence range of 46–57 months. However, defendant would still be required to serve 60 months based upon the statutory minimum penalty for distribution of 500 grams or more of cocaine powder. *See* 21 U.S.C. § 841(b)(1)(B).

### III

The evidence at trial established that all of the charged transactions were negotiated between defendant and undercover Drug Enforcement Agent Mark Ross, and that on each occasion the defendant initially attempted to sell cocaine powder to Ross. With respect to two of the transactions, Ross insisted that defendant convert the drugs into crack prior to the sale, and defendant complied.[10] To carry out this plan, Ross waited in his automobile while defendant entered a building and cooked (or had someone else cook) the cocaine in a microwave oven. The

evidence showed that it only takes a few minutes to accomplish the cooking.

As previously indicated, despite the relative ease and speed with which cocaine powder is converted into crack, the sale of crack is treated under the statutes and the sentencing guidelines as far more serious than identical violations involving cocaine powder. Despite its seeming illogic, the distinction has repeatedly been upheld, even as against attacks on grounds of equal protection stemming from alleged racial discrimination. *See United States v. Thompson*, 27 F.3d 671, 678 (D.C.Cir.1994) (summarizing cases upholding the disparate treatment of crack and cocaine powder against both Fifth Amendment and Eighth Amendment challenges).[11]

However, in one recent case Judge Oberdorfer of this Court refused to apply the guideline sentences and mandatory statutory minimums for crack on the basis that to do so would violate the defendants' rights under the Eighth Amendment. *United States v. Walls*, 841 F.Supp. 24, 31 (D.D.C.1994) (pending on appeal). Defendant here relies almost exclusively on *Walls*. However, the Court must reject the analogy because the facts here are quite different from those which were before Judge Oberdorfer.[12]

But that does not end the inquiry. As indicated above, the interplay between the statutory minimums, the sentencing guidelines, and the actions of the law enforcement officer in this case lead to an entirely unjust result, and one that, in practical terms, leaves the determination of the defendant's sentence in the hands of police officers.

---

**9.** Except for a non-violent offense approximately twenty years ago, defendant has no criminal record.

**10.** With respect to the first challenged transaction, defendant actually entered the agent's automobile with the powder cocaine, and was sent away to cook the drug.

**11.** The equal protection arguments have been made on the ground that the use of crack appears more prevalent among black persons, while the use of cocaine powder is more prevalent among whites.

**12.** The Court in that case explicitly relied on the fact that the sentence for crack distribution for the two defendants would have been increased

by five and nine times, respectively, over that for the distribution of cocaine powder. Judge Oberdorfer declined to extend his ruling to defendants where the disparity would not have been nearly as dramatic. Moreover, the Court notes that the Supreme Court and our Court of Appeals have demonstrated a determined unwillingness to apply the Eighth Amendment in non-capital cases. *See Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982); *United States v. Garrett*, 959 F.2d 1005 (D.C.Cir.1992); *United States v. Cyrus*, 890 F.2d 1245, 1248 (D.C.Cir.1989).

Having become versed in the distinction under the guidelines between powder and crack for sentencing purposes, it was probably inevitable that some police officers would begin to abuse it. That distinction presents an unparalleled opportunity for law enforcement to increase the sentence of a defendant with relatively little effort. After all, a police officer familiar with the penalties under the statutes and guidelines for various illegal drugs cannot persuade a defendant to, say, convert marijuana into heroin in anticipation of increasing the penalty. It simply cannot be done. The conversion of cocaine powder to crack, on the other hand, is easily accomplished by anyone with access to a stove or microwave oven. Moreover, it only takes a matter of minutes.[13]

One need be neither a psychic nor a cynic to ascertain Agent Ross's motive for insisting that the cocaine at issue be cooked. Agent Ross unquestionably understood the implications of his actions. In fact, he had previously testified, in an unrelated case conducted in this very courthouse, that he has insisted on the conversion of cocaine to crack because he was aware of the heavier sentences imposed on defendants convicted for crack offenses. *See United States v. Walls, supra*, 841 F.Supp. at 26. Moreover, his testimony indicated that it was a "policy" in his office to request the conversion to increase the putative defendant's exposure.[14]

## IV

The ability of a law enforcement officer to enhance a defendant's sentence through his own actions to enormous degree strikes at the very heart of our system of justice. It is entirely at odds with our constitutional system that police should be given the discretion vastly to increase a defendant's sentence through the mere expedient of insisting that

cocaine powder be cooked prior to its sale. It may rightfully be argued that had either Congress or the Sentencing Commission actually considered this possibility, they would not have condoned such a practice. In any event, as previously noted, this practice shocks the conscience of the Court.

Although the concept of just and individualized sentencing has been largely aborted in recent years through mechanical systems of mandatory minimums, sentencing guidelines, and such devices as considering as relevant conduct even actions for which a defendant has been acquitted, the Court still believes that justice, fairness, and the tailoring of a sentence to address a defendant's actual culpability retain a place within our system. It is to achieve these supreme values of a civilized, constitutional system of justice that the Court has determined that it is appropriate to calculate the defendant's sentence based on the weight of the drugs here sold as if the sales had involved only cocaine powder rather than crack.

## V

Because the sentencing guidelines remain relatively new, courts continue to struggle with their implications. With new legal mandates, such as the guidelines, come the development of new legal concepts to deal with potentially abusive applications. Two such concepts that have been discussed by some courts and that continue to evolve are the related doctrines of "sentencing entrapment" and "sentencing manipulation." While it does not appear that courts in this Circuit have yet explored these doctrines, other Circuits have. *See, e.g., United States v. Shephard*, 4 F.3d 647, 649 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994); *United States v. Connell*, 960 F.2d 191, 196 (1st Cir.1992).

---

13. None of this could be accomplished under a non-guideline system where the police officer cannot manipulate the punishment simply by reading a table to determine the sentence and acting in accordance therewith. Under traditional methods of sentencing, the sentencing decision is made by a judge on the basis of individual justice. Under such a system police officers obviously can neither calculate in advance nor manipulate sentences to be imposed.

14. Upon questioning from the Court in the instant trial, Agent Ross indicated that, subsequent to the *Walls* decision, this policy has been changed. The Court finds as a fact that, whatever the status of this new policy, if it exits (which is doubtful in view of the prosecution's apparent conclusion that the "old" policy was perfectly acceptable), it was not implemented by the agent in this case.

Although the doctrines appear to have been initially viewed as synonymous, recent decisions have continued to strive toward defining them with more particularity. *See, e.g., United States v. Jones,* 18 F.3d 1145, 1153–54 (4th Cir.1994); *United States v. Shephard, supra,* 4 F.3d at 649. "Sentencing entrapment" has been described as "outrageous official conduct which overcomes the will of an individual predisposed only to dealing in small quantities for the purpose of increasing the amount of drugs and the resulting sentence of the entrapped defendant." *United States v. Barth,* 990 F.2d 422, 424 (8th Cir.1993). "Sentencing manipulation," on the other hand, has been described as "outrageous government conduct that offends due process." *United States v. Jones, supra,* 18 F.3d at 1153.

To date, the doctrines appear to have surfaced almost exclusively in cases in which law enforcement officials have made repeated buys of drugs in order to achieve an increase in the total drug quantity for purposes of sentencing. *But see United States v. Shephard, supra,* 4 F.3d at 650 (rejecting Eighth Amendment argument based primarily on recognition that the purchase of cocaine on several occasions had proper law enforcement purpose). Although at least one Court of Appeals has explicitly recognized the validity of these doctrines, *see United States v. Barth, supra,* 990 F.2d at 424–25, this Court has found no decision in which, based upon the particular facts of the case, actual application of the doctrines has been deemed warranted. The government has heretofore been able to satisfy the particular courts that adequate factual reasons existed to justify the more severe sentences caused by aggregating a series of purchases, apparently on the assumption that the continued purchases were necessary for investigative purposes.

This case, however, presents a scenario that differs from those in which the more severe sentences were deemed appropriate. Here the defendant does not contest the aggregation of repeated buys or the ultimate quantity of drugs sold. To put it another way, the issue is not whether all three transactions were necessary for purposes of the government's investigation. Instead, the issue is whether Agent Ross's insistence that the cocaine powder be converted to crack before he would consummate the buys was justified by legitimate investigative needs on the one hand, or whether it served no purpose but to increase the defendant's ultimate sentence on the other. On this record, the Court finds as a fact that it was the latter.

As previously noted, Agent Ross had engaged in similar behavior for the purpose of increasing a defendant's sentence in prior investigations. The only explanation provided by the government for the repeated insistence that the person from whom Ross made his purchases cook the drugs prior to sale was that to have done otherwise would have undermined his cover as a purported crack dealer. But the Court takes judicial notice on the basis of its substantial experience with drug cases that many, if not most, crack dealers cook their own product. Thus, accepting cocaine powder from the defendant would not have comprised Ross's false identity.

Moreover, the record fails to demonstrate how this tactic might have advanced the goal of uncovering the defendant's suppliers. It was clear from the beginning that the supplier was providing cocaine powder, not crack. That was, after all, the very reason the defendant was having to cook the drug. Although investigative purposes might have justified a series of transactions, and thus the increase in the total quantity of drugs purchased, such did not justify the insistence that the cocaine be cooked.[15]

In short, the Court concludes that there was but one reason for the police insistence

---

15. Government counsel argued at the sentencing hearing that the Court's ruling might somehow undermine law enforcement's ability legitimately to investigate crack distribution. However, the argument proves too much. Nothing in the Court's decision prevents law enforcement officers investigating crack distribution from asking a suspect to sell them crack. However, when it becomes apparent that the suspect is attempting instead to sell cocaine powder, the officer's original investigative purpose cannot ratify the illegitimate insistence that the powder be converted to crack. If the suspect is a crack dealer, it can be logically assumed that the suspect will arrive with and complete the transaction with crack.

that the cocaine be cooked—to increase the defendant's punishment.[16] Whether these facts more accurately describe a case of "sentencing entrapment" or "sentencing manipulation" is probably irrelevant. The Court finds that Ross's conduct falls within the ambit of both. The defendant, though predisposed to sell cocaine, was asked to cook the cocaine for the sole purpose of increasing her resulting sentence. Under such circumstances, this conduct is specifically designed to manipulate the sentence received by undermining the defendant's due process rights. This purpose and practice must be viewed as outrageous. Thus, both doctrines are implicated.

If an individual's punishment is to be increased it should be done, under our system, by general directives from Congress and by specific decisions made by judges following trials or guilty pleas. It should not be accomplished through the actions of a police officer. Yet that will be the consequence if the prosecution's claim that in the instant case the sales be treated as sales of crack rather than of powder is accepted.

The Court's decision in this regard is not a "departure" from the statutory minimum penalty and the sentencing guidelines. Rather, the Court is simply applying both the statutory minimum and the guideline provisions that would have been applied absent the manipulative conduct of the agent in this case. In short, the defendant is being sentenced for her crime of trafficking cocaine powder. That is what she agreed to sell and would have sold but for the agent's determination to direct her to convert the powder to crack.

**16.** To counter this conclusion, the government relies primarily on *United States v. Lenfesty*, 923 F.2d 1293 (8th Cir.), *cert. denied*, 499 U.S. 968, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991). However, in that case, the court "rejected the defendant's claim that the undercover agent's only motive in repeatedly purchasing drugs from her was to increase ... her sentence." Government's Memorandum in Aid of Sentencing, at pp. 3–4. Here, of course, the Court has made a contrary finding of fact.

**17.** As this Court explained in *United States v. Roberts*, 726 F.Supp. 1359, 1362–66 (D.D.C. 1989), *rev'd on other grounds*, 964 F.2d 1186 (D.C.Cir.) (en banc), *cert. denied*, — U.S. —,

## VI

This Court, along with many others, has repeatedly expressed its dismay at the restraints Congress and the Sentencing Commission have hoist upon sentencing courts in recent years. *See, e.g., United States v. Spencer*, 817 F.Supp. 176 (D.D.C.1993), *remanded*, 25 F.3d 1105 (D.C.Cir.1994); *United States v. Bethancurt*, 692 F.Supp. 1427 (D.D.C.1988). The ever-increasing number of statutes prescribing mandatory minimum sentences significantly undermines the ability of judges to consider and assess relevant factors when sentencing defendants that come before them. Likewise, this strange calculus that is the sentencing guidelines reduces the responsibilities of the sentencing judge to little more than plotting points on a graph and announcing the mathematical result.

Congressional support for mandatory minimum sentences evidences their popularity. Likewise, the concept of sentencing guidelines—designed to eliminate unjustified disparities between punishment imposed by different judges—may have initially appeared advisable to some, if not many. Over time, however, the fault lines in those edifices have become increasingly apparent.

It can no longer be seriously argued that these attempts have been successful. Under the current system, prosecutors now have the virtually unreviewable power to manipulate a defendant's sentence (1) through charging decisions[17] and (2) through the grant or denial of departure recommendations.[18] As a consequence, the disparities

113 S.Ct. 471, 121 L.Ed.2d 378 (1992), a prosecutor has the ability under the guidelines, based on charging discretion, to achieve sentences varying to an astounding degree for the same fact situation. Not surprisingly, this discretion, exercised by many different prosecutors in many judicial districts, has led to disparate sentences.

**18.** Although the Court may have ultimate responsibility for determining a defendant's sentence if the government provides a departure letter pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1, that discretion is largely illusory. Those provisions give the government only the power, not the duty, to file a departure motion when a defendant has provided the government

have remained; they may even be more prevalent than before.

Basically, all that has occurred is that the ability to achieve disparity has been transferred from judges—who are generally experienced men and women and who exercise their duties following nomination by the President with the advice and consent of the Senate, in accordance with Article III of the Constitution—to Assistant U.S. Attorneys—who, whatever their individual intelligence and achievements, have been by and large but a brief period out of law school, and are therefore not likely to have acquired the background and maturity that is required for the determination of what constitutes just punishment for another human being.[19]

As if this unprecedented transfer of power and discretion were not enough, the prosecution's arguments in this case, if accepted, would approve yet a further departure from normal decision-making. However this process may be described or disguised, the practical effect is to vest the power of sentencing in the police officer on the street—even further removed from the judicial arena where it has traditionally reposed. For if the courts must honor a police officer's direction to a defendant to transform cocaine powder to cocaine base as a condition of the purchase, that decision will leave the sentence at the mercy of the policeman: if the officer accepts the powder proffered by the defendant the latter will receive one sentence, but if the officer insists that the powder be cooked, the defendant will actually receive—not merely be exposed to the possibility of—a far harsher sentence. In the instant case, in fact, the defendant's compliance with the agent's demand for cooking the cocaine would add over five years to her sentence.

From a broader view, if the philosophy advocated by the prosecution is valid, that is, if the prosecutor and the policeman are invested with such extraordinary discretion, the Judiciary, established by the Constitution as a means for checking the power of the other branches of government when exercised extra-constitutionally, and, under the Bill of Rights as the instrument for protecting accused persons from governmental overreaching, will simply have to stand by, powerless to exercise its traditional responsibilities.

This Court is not prepared to proceed on so dismal a premise. It continues to believe that among the core functions of the Judiciary are its ability to stand as a bulwark against overreaching by law enforcement and to achieve justice under law. The Court has accordingly sentenced the defendant to 60 months incarceration on counts 1, 2, 4 and 5 (to run concurrently with each other) on the basis that the two challenged drug sales should be viewed as cocaine powder as opposed to crack, and to an additional 60 months on count 3, the firearms charge, which, in accordance with the statute, will run consecutively to the sentence imposed on the other counts. This results in a total of ten years imprisonment rather than the total of in excess of fifteen years otherwise calculated.

---

with substantial assistance. *See Wade v. United States*, —— U.S. ——, ——, 112 S.Ct. 1840, 1843, 118 L.Ed.2d 524 (1992).

**19.** For this reason, no doubt, the current system does not find any parallels in the common law, either in England following the Magna Carta or in the United States following ratification of the Constitution.