UNITED STATES of America

v.

Rodger EDMONDS, Defendant.

Crim. No. 90–393–04 (CRR).

United States District Court,
District of Columbia.

Dec. 15, 1994.

Rachel Adelman Pierson, Asst. U.S. Atty., along with Eric Holder, Jr., U.S. Atty., and John M. Facciola, Asst. U.S. Atty., for Government.

Peter M. Brody and James M. Lichtman, of Ropes & Gray, Washington, DC, for defendant.

Rodger Edmonds, pro se.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

Before the Court is the Defendant's Motion to Vacate, Set Aside or Correct Sentence

Under 28 U.S.C. § 2255, along with the Defendant's First, Second, and Third Supplemental Memoranda in Support thereof.[1] The Defendant, through counsel, raises two claims which he asserts entitle him to relief from his conviction: (1) that the prosecution violated his right to due process by presenting perjured testimony; and (2) that the statutory provision under which the Defendant was convicted and sentenced, 21 U.S.C. § 841(b), must be struck down as violating the Eighth Amendment and the Equal Protection Clause of the United States Constitution.

The Defendant also raises the following claims *pro se:* (1) that the jury was instructed on an "aiding and abetting" theory of liability which was not properly presented by the Government; (2) that the Government knowingly presented false testimony to the grand jury by a Government agent, Gary Davis; and (3) that the Defendant was deprived of effective assistance of counsel as a result of his trial counsel's agreement to a prejudicial stipulation regarding chemist reports.[2]

The Court is in receipt of the Government's responses to the Defendant's pleadings submitted through counsel, as well as its responses to the Defendant's numerous *pro se* pleadings. The Government asserts, in sum, that the Defendant's claims are procedurally barred for failure to raise them at trial, sentencing, or on direct appeal and that, notwithstanding the procedural bar, the Defendant's claims must fail on the merits.

In addition, the Government and the Defendant through counsel have each prepared proposed Findings of Fact and Conclusions of Law, exchanged the same, marked up their opponent's proposed findings to indicate those issues which remain in dispute, and filed marked-up copies with the Court. The Court is also in receipt of the Defendant's "Facts and Findings of 2555 [sic] Motion," submitted *pro se.*

Upon careful consideration of the written submissions of counsel for the Defendant, of the Defendant *pro se,* and of the Government, along with the oral arguments of counsel for both parties and the Defendant, the applicable law, and the entire record in this

1. The instant motion has a long procedural history. On December 12, 1992, the Defendant, acting *pro se,* filed a motion for relief under § 2255, raising the following grounds: (1) that the sentencing scheme for cocaine base offenses is unconstitutional; (2) that the jury was instructed on an "aiding and abetting" theory of liability which was not presented by the Government; (3) that the Government intimidated a potentially exculpatory witness, co-defendant Anthony Morse; (4) that the indictment was predicated on false testimony before the grand jury by a Government agent, Gary Davis; and (5) that a key Government witness, co-defendant Julius Harrison, perjured himself before the jury.

The Government filed an opposition and the Defendant filed supplemental briefs *pro se.* One of those pleadings raised a sixth ground for relief, namely, ineffective assistance of trial counsel. On August 10, 1993, the Court granted the Defendant's request for appointment of counsel for purposes of the § 2255 motion. On September 27, 1993, counsel for the Defendant submitted a supplemental memorandum on the constitutional challenge to the sentencing scheme for cocaine base offenses. At a hearing held October 7, 1993, the Defendant withdrew as grounds for his motion the claim that the jury was improperly instructed on an "aiding and abetting" theory of liability (though the claim is now before the Court per a pleading the Defendant filed October 6, 1993, in which he clarified the issues raised by his motion), and that the Government intimidat-

ed a witness. The Defendant also abandoned his claim that trial counsel was ineffective, but preserved the right to raise it as an alternative ground for relief. *See* Motion for Relief Pursuant to 28 U.S.C. § 2255 at 3–4 (Oct. 29, 1993). The Court directed counsel to prepare a new motion pursuant to § 2255, which was filed by the Defendant through counsel on October 29, 1993, and which raised the two substantive arguments presently before the Court through counsel, namely, the constitutionality of the sentencing scheme for cocaine base offenses, and the Government's alleged knowing use of perjured testimony.

2. By pleading filed December 6, 1993, the Defendant clarified the precise issues he sought to raise through counsel and *pro se,* as set forth above, and the Government responded accordingly. In his "Facts and Findings of 2555 [sic] Motion," filed October 18, 1994, however, the Defendant raises a Thirteenth Amendment challenge to the sentencing scheme for crack cocaine offenses, arguing that it is an effort by the Federal Prison Industries ("UNICOR") to attract slave labor. While this claim is not properly before the Court, which therefore does not have the benefit of a written response thereto, the Court nevertheless rejects the Defendant's Thirteenth Amendment claim as frivolous, unsubstantiated, and wholly without merit.

case, the Court finds that the Defendant's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 shall be denied. In particular, the Court finds that each claim raised by the Defendant through counsel and *pro se* lacks any merit entitling the Defendant to relief from his conviction.[3]

## BACKGROUND

On May 7, 1991, Defendant Rodger Edmonds was convicted by a jury of conspiracy to distribute 50 or more grams of cocaine base, distribution of 50 or more grams of cocaine base, and distribution of 50 or more grams of cocaine base within 1000 feet of a school.

Edmonds' first trial on these charges resulted in a hung jury. Approximately one week before the second trial, the Defendant rejected the counsel who had been appointed for him for the first trial, Mr. Kriegsheim, and obtained new counsel, Mr. Douglas and Ms. Ludaway. At that time, Mr. Kriegsheim gave Mr. Douglas all of the transcripts, paperwork, and all other materials that he had prepared for the case. Moreover, in contrast to the first trial, the Defendant declined to testify on his own behalf.

Based upon the trial testimony and exhibits, the Government case against the four co-defendants revolved around an alleged scheme to sell drugs to someone who, unbeknownst to the Defendants, was an undercover Drug Enforcement Agency ("DEA") agent. As part of an operation targeting high-level drug suppliers, DEA Special Agent Gary Davis had contacted Ali Zamani, a bartender at a local restaurant, concerning the purchase of crack cocaine. (Tr. 84–86). Acceding to several requests from Agent Davis, Zamani contacted Julius Harrison, with whom Agent Davis subsequently had numerous conversations regarding the purchase of kilogram and pound quantities of cocaine base. (Tr. 85–86). Harrison made it clear that the crack cocaine was not his but that he would unite Agent Davis with his source, whom Harrison called "his boy." (*Id.*).

Harrison and Agent Davis agreed that their transaction would take place on August 29, 1990, at 6:30 p.m., at which time Harrison was to sell four ounces of crack cocaine to agent Davis for $5,600. (Tr. 87, 89). Anthony Morse and the Defendant Edmonds were also present when the transaction was consummated, allegedly acting as part of the

3. Given the particular procedural history of the instant § 2255 motion, the Court shall proceed directly to the merits of the Defendant's claims, notwithstanding the Government's argument that the Defendant is procedurally barred from raising them on collateral attack. In this case, the Court of Appeals granted—without objection—the Defendant's Motion to Stay his appeal pending the disposition of the Defendant's post-conviction motion. Order of the Court of Appeals for the District of Columbia Circuit (Nov. 12, 1992). This Circuit has held that "there is no jurisdictional bar to the District Court's entertaining a Section 2255 motion during the pendency of a direct appeal," but further advised that "the orderly administration of criminal law precludes considering such a motion absent extraordinary circumstances." *Womack v. United States*, 395 F.2d 630, 631 (D.C.Cir.1968). The Court seriously questions whether the challenges raised in the instant motion rise to the level of an "extraordinary circumstance" warranting collateral review during the pendency of a direct appeal. In view of the stay granted by the Court of Appeals, however, and the resources expended by this Court in holding an extensive evidentiary hearings and arguments on the Defendant's instant motion, the Court shall address the merits of the § 2255 motion without a lengthy discussion of the procedural challenge thereto. In so doing, the Court hopes to facilitate the Court of Appeals' thorough and efficient review of all issues on appeal.

However, the Court wishes to emphasize that the Government raises a serious procedural challenge to the Defendant's claim that the prosecutor knowingly presented perjured testimony at trial. Although, as explained below, the Court finds no merit to the Defendant's claim, the record shows that the Defendant was apprised at the time of trial of the information that is now the focus of his instant claim, namely, the date of Zamani's leukemia diagnosis. The Court thus observes that the Defendant waived his perjury claim by failing to raise it at trial. Moreover, in view of the Defendant's exposure to the relevant facts at trial, the Defendant cannot show cause excusing his procedural default; nor, as explained below, can he show prejudice resulting from such error, because the contested testimony was not material and did not constitute perjury knowingly solicited by the Government. *Coleman v. Thompson*, 501 U.S. 722, 747, 751, 111 S.Ct. 2546, 2563, 2565, 115 L.Ed.2d 640 (1991); *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816 (1982).

"team" participating in the deal. (*See* Tr. 140–55).

Harrison and Agent Davis met at Union Station at the predetermined time and drove to Third and E Streets, 520 feet from Stuart Junior High School. (Tr. 89, 141–42). During the drive, Harrison advised Agent Davis that "he would be meeting with his people and pick up the cocaine." (Tr. 94). When they arrived at Third and E Streets, Harrison got out of the unmarked police vehicle, walked down Third Street and went out of Agent Davis' sight. (Tr. 95, 143). Meanwhile, Edmonds had been cruising around the neighborhood in a black Datsun 240 accompanied by Anthony Morse. (Tr. 144). Edmonds pulled over to the right side of Third Street, and Harrison approached the Datsun and made contact with Edmonds and Morse. (Tr. 145). Five minutes later, Harrison returned to Agent Davis and asked to count Agent Davis' money before handing over the drugs. When Agent Davis refused, Harrison again exited the car and began walking up Third Street toward the Datsun driven by Edmonds. (Tr. 95, 145). This time, upon returning to Agent Davis, Harrison was said to have stated that "his people didn't like how the deal was going to go" and, after further negotiations, left the vehicle for the third time and proceeded up Third Street. (Tr. 96).

Five minutes later, Morse and Harrison returned to Agent Davis' car, while Edmonds sat on the stoop of a row house located three or four houses from the corner where Agent Davis was parked. (Tr. 146). Harrison and Morse left the vehicle, went to a nearby alley, and returned approximately five minutes later. (Tr. 97, 147–48). Edmonds left the stoop and drove to the corner of Third and E Streets. (Tr. 148, 150–51). Morse showed Agent Davis the crack cocaine, Agent Davis opened his trunk to retrieve the money, and the surveillance team responded by arresting Harrison and Morse. (Tr. 98, 151). Edmonds then accelerated from the scene and was apprehended by two police vehicles. (Tr. 98, 151–52, 158–59).

When Harrison was arrested, he possessed a business card; written on the card was the name "J. Harrison," the phone number

Agent Davis used to contact Harrison, the name "Ali," Ali Zamani's phone number, Agent Davis' pager number, the name "Rog," and the pager number matching the number of the pager taken from Edmonds at the time of his arrest. (Tr. 101–04, 193–94).

The Government focused on the testimony of two witnesses to prove its case against the Defendant Edmonds. First, Julius Harrison, who had a crack cocaine habit from 1979–1988, testified in detail about the Defendant Edmonds' role as Harrison's drug supplier. (Tr. 173–74). Harrison recounted his relationship with Edmonds, which included "[a] lot, over a hundred" drug transactions. (Tr. 172–73). According to Harrison, a "pretty good friend" of his, Ali Zamani, who was very ill (and subsequently died), solicited Harrison to help him locate drugs for a Dr. Gary Cambyz (Agent Davis's undercover name). (Tr. 177–78). Harrison testified that he therefore contacted Edmonds about supplying the crack cocaine for the impending transaction with Agent Davis. (Tr. 179, 181–82). Describing the transaction in detail, Harrison claimed that Edmonds played an important role in negotiating the sale and that Edmonds also functioned as a look-out. (Tr. 182–95). Harrison testified that he "knew that [he]'d be getting something, either cash or cocaine, out of the deal" because "over a period of nine years of knowing Rodger, [they'd] done this a number of times," that is, they had "had exchanges of cocaine and money." (Tr. 194).

The Government also stressed the importance of testimony given by DEA Special Agent Ronald Kahn. Agent Kahn was part of the DEA surveillance team monitoring the transaction. At least twice, Agent Kahn observed the Defendant Edmonds looking at Julius Harrison and Anthony Morse while the transaction unfolded, (Tr. 149, 151), and testified that he thought Edmonds, Harrison and Morse were talking both before and during the time in which Harrison negotiated the terms of sale with Agent Davis. (Tr. 144–46, 149). Moreover, according to Agent Kahn, when Edmonds drove his car to the intersection of Third and E Streets, he had a full view of the area in which Harrison was making the exchange with Agent Davis and

"was looking over towards [that area] while the transaction was taking place." (Tr. 150–51). Also, Agent Kahn observed Edmonds flee from the scene as soon as the police converged on the car in which the DEA agents were sitting. (Tr. 151–52, 158–59).

Agent Davis, the undercover police officer who invited the drug transaction and was present at the arrest, also testified for the Government at trial and in the grand jury proceedings. He testified as to the events surrounding the sale as he knew them from his end of the transaction, and also to what had occurred just prior to the arrest. (Tr. 83–139).

In his defense, Edmonds argued that he was at the wrong place at the wrong time and had no knowledge of the drug activities taking place.

On December 11, 1991, this Court sentenced Edmonds to two terms of 175 months of incarceration to run concurrently. In a Memorandum Opinion dated June 4, 1991, the Court denied the Defendant's Motion for Judgment of Acquittal and Motion for New Trial, finding that the evidence was sufficient to support his conviction, that a showing that the Defendant had knowledge that drugs were distributed within 1,000 feet of a public school area was not required, that a letter from Anthony Morse allegedly exonerating the Defendant was not "new" evidence that could form a basis for a new trial, and that even if the letter were newly discovered evidence, it was not of sufficient credibility to warrant a new trial. *United States v. Edmonds,* 765 F.Supp. 1112 (D.D.C.1991).

The Defendant timely filed notice of direct appeal. On December 14, 1992, the Defendant filed, *pro se,* a ninety-six page motion seeking vacation of his sentence pursuant to 28 U.S.C. § 2255. By Order of November 12, 1992, the Court of Appeals stayed the appeal pending resolution of the Defendant's § 2255 motion. This Court appointed counsel for the Defendant, who then filed briefs advancing the two above-mentioned grounds for relief. As noted, the Defendant also raised three claims *pro se.* The Court held a hearing on the instant motion on August 26, 1994, on December 5, 1994, and on December 7, 1994, at which the Court heard testimony,

and at which counsel for both parties, and the Defendant himself, presented oral argument on the Defendant's claims.

## DISCUSSION

**I. THE COURT FINDS THAT THE DEFENDANT'S DUE PROCESS CLAIM MUST FAIL ON THE MERITS AS HE HAS NOT SHOWN THAT HARRISON'S TESTIMONY WAS PERJURED OR THAT THE PROSECUTION WSA AWARE OF THE ALLEGED PERJURY**

In order to gain relief in a § 2255 collateral challenge, a movant must show "a good deal more than would be sufficient on a direct appeal from his sentence." *United States v. Pollard,* 959 F.2d 1011, 1020 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 322, 121 L.Ed.2d 242 (1992). Relief is warranted only if the Court determines that "the challenged sentence resulted from 'a fundamental defect which inherently results in a complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure.'" *Id.* (quoting Fed.R.Crim.P. 32, Advisory Committee's Note on 1983 Amendment (internal quotation marks omitted)). Because the Court finds without merit each of the Defendant's five claims, the Court shall not disturb the sentence properly imposed on the Defendant.

As grounds for his § 2255 Motion to Vacate Sentence, the Defendant first argues that Julius Harrison, a Government witness, testified falsely concerning his own motives for selling cocaine, and that the Government knew that Harrison's testimony was false. The Court is wholly unpersuaded by this claim.

In particular, the Court determines that, as a factual matter, the Defendant has shown neither that Harrison's testimony was perjured nor that the prosecution was aware of the alleged perjury. Moreover, even if the Defendant had established a factual basis for his claim, the Court finds that the alleged perjury was not material, as it involved a single statement concerning the witness' motive for committing the crime, and not the facts that led to the Defendant's conviction.

Finally, the Court observes, based on the record, that any knowledge of "perjury" attributable to the Government is also attributable to Edmonds himself, thereby resulting in a waiver of that claim for failure to raise it at trial.

■ It is well settled that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (citations omitted). *See also Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *United States v. Iverson*, 637 F.2d 799 (D.C.Cir.1980), *modified*, 648 F.2d 737 (D.C.Cir.1981). This result obtains when the prosecution deliberately solicits false testimony as well as when the Government knew or should have known of the false testimony, *Iverson*, 637 F.2d at 803, and "allow[ed] it to go uncorrected when it appear[ed]." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177. Applying these principles to the facts of this case, the Court finds that the Defendant's claim must fail.

■ As a preliminary matter, the Court is not convinced that Harrison committed perjury by testifying falsely with the requisite willful intent. In order to prove that Harrison's testimony was perjurious, the Defendant must show that Harrison "gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993) (citing 18 U.S.C. § 1621(1) ("Whoever ... willfully and contrary to [the] oath states or subscribes any material matter which he does not believe to be true ... is guilty of perjury....")). Under the facts of this case, the

Court cannot find that Harrison committed perjury.

The Defendant points to the following testimony by Harrison as perjurious: "I knew Ali was sick. I knew Ali was dying of leukemia, but he told me he knew a doctor, a Dr. Gary Camby[z], and Dr. Camby[z] was going to be able to help him if he was able to find him some drugs." (Tr. 177). Although it is undisputed that Zamani was not diagnosed with chronic myelogenous leukemia until December 24, 1990,[4] when he was admitted to Washington Medical Center for headaches and blurred vision that had begun three to four weeks prior, it is also undisputed that Zamani was diagnosed with diabetes in 1986 and thereafter took insulin to control the condition. First Stip. at ¶¶ 3, 2 (Aug. 25, 1994). The parties further agree that "[i]n connection with his diabetes, Mr. Zamani reported a temporary vision problem to his doctor on June 13, 1989," and that "[i]n the Spring of 1989, Mr. Zamani sustained a fractured ankle and hip in an automobile accident" for which he had surgery and took pain medication for a period of time. First Stip. at ¶¶ 1, 2.

Thus, the record reveals that Zamani had a history of significant medical problems and that, a few months after the drug transaction, he began experiencing physical symptoms that culminated in his leukemia diagnosis and eventually led to his death.[5] Indeed, Agent Davis, who posed as a physician while dealing with Zamani, testified that Zamani limped and complained to him of pain resulting from a severe accident. (Tr. Aug. 26, 1994, 44–46). Further, Harrison testified at trial that Zamani had a history of poor health; he stated, "since the time I've been going to Ali for seven years ... his health has been deteriorating ever since I've known him...." (Tr. 176–77).

Accordingly, in view of Harrison's testimony as to Zamani's deteriorating health over a period of years, and the evidence confirming Zamani's poor health, the Court cannot find that Harrison's perjured himself. The Defendant has failed to show that Harrison's

---

4. The drug transaction underlying the Defendant's conviction occurred on August 29, 1990.

5. In a pretrial services report dated September 24, 1990, Zamani told the agency that he had a "physical problem."

statement regarding Zamani's particular medical condition at the time of the drug transaction was the result of willful intent to provide false testimony. Rather, the facts suggest that Harrison's testimony was as likely the result of confusion, mistake, or faulty memory. Moreover, Harrison clarified on cross-examination that Zamani in fact "didn't tell him he was dying." (Tr. 203). Thus, viewing the record as a whole, the Court finds that the jury was not left with an erroneous impression that could have affected their judgment.

 In addition, even if the Court were to agree with the Defendant that, based on the chronology of Zamani's illness and diagnosis, Harrison lied on the stand, the Court further finds that the allegedly perjured testimony was not material. The "perjury" here did not bear on any element comprising the offenses of which the jury found Edmonds guilty. Rather, it concerned only the collateral matter of Harrison's motive for participating in the transaction.

The Defendant argues that this testimony went to Harrison's credibility. Although the principle that the Government may not knowingly use false evidence is no less applicable when such evidence goes to witness credibility only, *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177, in a majority of the cases cited by the Defendant, the perjury at issue involved the jury's ignorance of facts concerning the witnesses' motive to testify in the Government's favor. *See, e.g., Giglio*, 405 U.S. at 154–55, 92 S.Ct. at 766; *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177; *Iverson*, 637 F.2d at 803. *Cf. United States v. Wallach*, 935 F.2d 445, 455 (2d Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993) (witness repeatedly gave false testimony that he had stopped his compulsive gambling). As the Court of Appeals for this Circuit reasoned, "[i]n practical experience, few, if any, factors are more likely to induce an accused to testify, possibly falsely, against another, than the expectation of prosecutorial or sentencing leniency." *Iverson*, 637 F.2d at 803.

In the instant case, however, the jury was expressly instructed that the Government agreed to dismiss some charges against Har-

rison, and that the Government agreed not to prosecute him in exchange for his agreement to plead guilty and testify against the Defendant Edmonds. Final Jury Instructions, filed May 7, 1991, at 11–12. Moreover, the jury was advised in the Court's instructions, a copy of which were sent into deliberations, that it should examine Harrison's testimony with caution and care because such a witness has a motive to testify favorably to the Government. *Id.* at 12. The Court therefore finds that, unlike in the majority of cases cited by the Defendant, the jury here was fully informed of Harrison's incentive to testify falsely and was directed to weigh his credibility with particular care and caution. The Court therefore declines to upset the Defendant's sentence, rendered pursuant to the jury's judgment as to his guilt, simply because Harrison may have misrepresented one of his motives for participating in the drug transaction.

Finally, the Court observes that Harrison admitted before the jury that he had been a regular drug user who sold drugs many times, that he arranged the drug transaction in this case, and that he expected to receive "either cash or cocaine, out of the deal." (Tr. 173–74, 194). Thus, the Court finds it highly unlikely that the jury would be influenced by Harrison's professed laudatory motive for drug-dealing in view of his history of drug addiction and crime, and his clear motive for performing the crime in question—money and drugs. Accordingly, the Court finds that there is no reasonable likelihood that such arguably perjurious testimony concerning Harrison's other motives would have had any impact on the jury's determination of credibility.

 Further, the Court finds that, while the testimony in question was not clearly perjurious, and not material to the jury's decision, the Defendant has not shown that the Government knew or should have known of the alleged perjury. Given Zamani's history of illness, the Court surely cannot find that Government counsel knew of the alleged perjury when Harrison uttered the words in question or, as Defendant argues, that Government counsel even should have known at that time what the precise status of Zamani's

medical condition had been when the drug transaction took place. In view of the immateriality of the testimony in question, as well as Harrison's professed seven-year acquaintance with Zamani, the Court finds dubious the assumption that the prosecution should have concluded on the spot that Harrison was lying about his particular knowledge of Zamani's medical condition; indeed, defense counsel did not so conclude while hearing the same testimony. Thus, the Court finds that any error on the part of the Government does not amount to knowing use of perjured testimony under the relevant law.

■ Lastly, the Court observes that the Defendant's argument is substantially weakened by the fact that, like the Government, he was served, prior to trial, with pleadings filed by Zamani which referenced the date of his leukemia diagnosis. If the prosecutor knew or should have known of the alleged perjury, as the Defendant argues, the Defendant also knew or should have known of the alleged perjury and waived any claim on that ground by failing to object at trial. The

Defendant cannot have it both ways. Moreover, the fact that the Defendant secured different counsel at the second trial, who had access to the complete record in this case, does not influence the Court's observation. Although the Defendant did not participate in all of the hearings on Zamani's continuance motions,[6] the Government counsel's arguably greater exposure to (not necessarily her knowledge of) the reasons why Zamani sought a continuance, does not erase the fact that the Defendant, whether personally or through his counsel, had knowledge of the date of Zamani's leukemia diagnosis.[7] Thus, although the Court finds that the Defendant's claim that the Government knowingly elicited perjured testimony must fail on the merits, the Court further observes that the Defendant waived the right to attack his conviction on that ground by failing to raise it at trial.[8] *United States v. Iverson,* 648 F.2d 737, 738 n. 7 (D.C.Cir.1981) ("When a criminal defendant, during his trial, has reason to believe that perjured testimony was employed by the prosecution, he must im-

6. The Defendant was present during the morning session of a hearing held on January 4, 1991 regarding Zamani's motion to continue his trial date based on his leukemia diagnosis. The Court inquired of counsel whether the Defendant objected to the continuance, which he did not, and confirmed that Mr. Kriegsheim had consulted with the Defendant regarding the motion and, the Court must assume, the reasons therefor. (Tr. Jan. 4, 1991, at 5). The Defendant waived his right to be present during the afternoon session, but Mr. Kriegsheim was present. (Tr. Jan. 4, 1991, at 15). During the afternoon session, Dr. William K. Kelly, Ali Zamani's physician specializing in the treatment of blood diseases and cancer, testified regarding Zamani's medical condition and the date of his diagnosis. (Tr. Jan. 4, 1991, at 16–17).

7. The Court notes that it has had an extensive opportunity to observe the Defendant throughout two trials, at sentencing, and during the lengthy litigation of this § 2255 motion. It has been apparent from the Defendant's many *pro se* pleadings, his eagerness to address the Court directly, and his frequent, intense conversations with counsel, that the Defendant is an intelligent man who has been intimately involved with all aspects of this case. It was the Defendant, in his *pro se* motion filed in December 1992, who first argued that Harrison's testimony concerning Zamani's illness was perjured. The Court observes that, according to the Defendant's testimony at the hearing on his instant motion, he formulated this claim without the relevant pretrial motions

or transcripts available to him. (Tr. Oct. 7, 1994 at 21, 22). Defendant's Motion Pursuant to 28 U.S.C. § 2255, at 89. In other words, he did so without any written record or any information in addition to that which was available to him at trial. Inconsistently, the Defendant later testified that the perjury claim first became clear to him when he read the relevant pretrial transcripts. (Tr. Oct. 7, 1994 at 23). The Court does not credit this testimony.

8. At some point in his voluminous papers, the Defendant argues, in the alternative, that if his trial counsel did know or, with reasonable diligence, could have known that Harrison's testimony was perjured, then his counsel's failure to cross-examine Harrison on this issue constitutes ineffective assistance under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Applying the same *Strickland* analysis set forth in Part III.C., *infra,* however, the Court rejects any such claim. Indulging a strong presumption that his counsel's action was strategic, *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, the Court observes that the Defendant could not successfully show that his counsel was deficient in failing to cross-examine Harrison on such an immaterial point. Moreover, as the above discussion suggests, the Defendant could not show that he was prejudiced by his counsel's failure to address a detail which would not have likely influenced the jury.

peach the testimony at the trial and 'cannot have it both ways.'") (quoting *Ross v. Heyne*, 638 F.2d 979, 986 (7th Cir.1989)). *See also United States v. Biberfeld*, 957 F.2d 98, 104–05 (3rd Cir.1992), and cases cited therein (a defendant's knowledge of information constituting the alleged perjury coupled with his ability to act on it at trial is fatal to § 2255 motion).[9]

## II. THE DEFENDANT'S CONSTITUTIONAL CHALLENGES TO THE SENTENCING SCHEME FOR CRACK OFFENSES MUST FAIL UNDER THE SETTLED LAW OF THIS CIRCUIT

■ The Court further finds that the Defendant's constitutional challenge to the sentencing scheme for crimes involving cocaine base (a/k/a "crack") is foreclosed by the law of this Circuit. Recently, as acknowledged by counsel for the Defendant,[10] the equal protection challenge raised here was squarely addressed and rebuffed by the Court of Appeals for the District of Columbia Circuit in *United States v. Johnson, et al.*, 40 F.3d 436 (D.C.Cir.1994). In particular, the Court responded to the claim, raised through three separate appeals, that the Anti–Drug Abuse Act of 1986 ("1986 Act"), Pub.L. 99–570, and the federal Sentencing Guidelines violate "the equal protection component of the Fifth Amendment by disproportionately and invidiously impacting blacks through meting out of harsher penalties for offenses involving crack cocaine—as opposed to sentences received by offenders possessing identical amounts of powder cocaine." *Id.* at 438.

Having reiterated the general principal that strict scrutiny is triggered only upon a showing of invidious discriminatory purpose,

*id.* at 439, the Court of Appeals found that a racially discriminatory intent could not be attributed to Congress in passing the 1986 Act. The Court observed, "[w]hether one believes the disparity between crack sentences and cocaine sentences is 'fair' or not, we think the [ ] scattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress." *Id.* at 440 (citation omitted).

■ The Defendant argues that he still has a viable Eighth Amendment claim. However, the Court of Appeals for the District of Columbia Circuit has "already held that the disparate treatment of crack and powder cocaine easily survives both rational-basis review and Eighth Amendment challenge." *United States v. Thompson*, 27 F.3d 671, 678 (D.C.Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 650, 130 L.Ed.2d 554 (citing *United States v. Cyrus*, 890 F.2d 1245, 1248 (D.C.Cir.1989)). In the Court's view, its Eighth Amendment inquiry ends with *Thompson* and *Cyrus*. In *Cyrus*, the Court found "baseless" the argument that the higher term for cocaine base possession violates the Eighth Amendment because it is disproportionate to the crime. *Cyrus*, 890 F.2d at 1245. The same statutory provision has withstood numerous Eighth Amendment challenges in other circuits as well. *See, e.g., United States v. Garcia*, 20 F.3d 670, 673 (6th Cir.1994); *United States v. Frieberger*, 28 F.3d 916, 920 (8th Cir.1994); *United States v. Savinovich*, 845 F.2d 834, 839–40 (9th Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988); *United States v. Easter*, 981 F.2d 1549, 1556 (10th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2448, 124 L.Ed.2d 665 (1993).[11]

---

**9.** The Defendant raises an additional argument *pro se* with respect to Harrison's testimony, namely, that "Harrison's testimony that Edmonds was the supplier of the drugs could not be true based on the evidence." Facts and Findings of 2555 [sic] Motion, at 20. The Court has already found, however, that the evidence before the jury was sufficient to support the Defendant's conviction. *United States v. Edmonds*, 765 F.Supp. 1112 (D.D.C.1991). The Defendant makes no viable argument to the contrary. Nor does he present any evidence of perjury.

**10.** Letter dated December 8, 1994 to the Court from Mr. Peter M. Brody, Esq., counsel for the Defendant. Mr. Brody attaches a copy of *United States v. Johnson, et al.*, 40 F.3d 436 (D.C.Cir. 1994).

**11.** Moreover, the Court observes that recent Supreme Court jurisprudence renders suspect the very viability of the Eighth Amendment "proportionality" theory. *See Harmelin v. Michigan*, 501 U.S. 957, 965, 111 S.Ct. 2680, 2686, 115 L.Ed.2d 836 (1991) (Scalia, J. & Rehnquist, C.J.) ("[T]he Eighth Amendment contains no proportionality guarantee."). *See also United States v. Chandler*,

The Defendant relies on *United States v. Walls*, 841 F.Supp. 24, 32–33 (D.D.C.1994), however, to suggest that, notwithstanding *Cyrus* and *Thompson*, he still has a cognizable claim under the "arbitrary and capricious" theory of the Eighth Amendment. Upon review of the hearing transcripts and the Defendant's pleadings, the Court has pieced together what appears to be a two-pronged argument under this theory. First, the Defendant points to the legislative history to suggest that the penalty ratio between crack and powder was "bumped up to a hundred to one for no substantive reason other than that Congress wanted to show that they were getting tough." (Tr. Aug. 26, 1994, at 109). Second, the Defendant argues that the sentence range was arbitrary and capricious "as applied" to Edmonds. Defense counsel states that "[i]n fact, having already served nearly four years of confinement, Edmonds would be a free man today if crack were not punished more harshly than powder." Defendant's Proposed Findings of Fact and Conclusions of Law, at 56. The Court finds no merit to either argument.

The "arbitrary and capricious" analysis, as explained by Judge Oberdorfer in *Walls*, is gleaned from Justice White's concurring opinion in *Furman v. Georgia*, 408 U.S. 238, 312, 92 S.Ct. 2726, 2763, 33 L.Ed.2d 346 (1972), and from another death penalty case, *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). Judge Oberdorfer concluded that application of the heightened crack sentences to two of the defendants in *Walls* violated the Eighth Amendment because their imposition would be arbitrary and capricious and would provide "only marginal contributions to any discernable social or public purposes." *Walls*,

841 F.Supp. at 33 (quoting *Furman*, 408 U.S. at 312, 92 S.Ct. at 2763 (White, J., concurring)).

However, the *Gregg* case specifically recognized that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice," and that because of "the uniqueness of the death penalty," the "sentencing procedures created a substantial risk that [the death penalty] could be inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 188, 96 S.Ct. at 2932. This Court declines to stretch the non-binding dictum of Justice White's concurrence in *Furman*, or *Gregg*'s discussion in the context of the death penalty in particular, to the term-of-years sentencing scheme for crack offenses.[12]

Even if the Court were to find the so-called "arbitrary and capricious" analysis applicable here, the Court cannot conclude that Congress' passage of the 21 U.S.C. § 841(b) was arbitrary and capricious. Indeed, counsel for the Defendant conceded as much at oral argument. (*See* Tr., Aug. 26, 1994, at 105). As the Court of Appeals for the Seventh Circuit explained,

> Establishing prison terms for "individual crimes involves consideration of factors that, as a general matter, is largely the function of the legislature, not the courts," and, accordingly, we ordinarily grant substantial deference to the legislative determination. Thus, eighth amendment challenges to sentences that are both prescribed by the guidelines, and within the statutory maximums established by Congress, are looked on with disfavor.

*United States v. Saunders*, 973 F.2d 1354, 1365 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993)

36 F.3d 358, 365 (4th Cir.1994); *Simmons v. Iowa*, 28 F.3d 1478, 1482 n. 5 (8th Cir.1994); *United States v. Morse*, 983 F.2d 851, 855 (8th Cir.1993); *Neal v. Grammer*, 975 F.2d 463, 465 (8th Cir.1992); *United States v. Oakes*, 11 F.3d 897, 899–900 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994). *But see Harmelin*, 501 U.S. at 996, 111 S.Ct. at 2702 (per Kennedy, J., O'Connor, J., and Souter, J.) ("*stare decisis* counsels our adherence to the narrow proportionality principle that has existed in our Eighth Amendment jurisprudence for 80 years"); *United States v. Angulo–Lopez*, 7

F.3d 1506, 1509 (10th Cir.1993) (noting that the *Harmelin* Court reached no consensus).

**12.** As counsel for the Defendant stated at oral argument, "Judge Oberdorfer's decision was in some sense a path-breaking decision on this point." (Tr. Aug. 26, 1994, 104–05). Defense counsel advised that he "combed the case books to try to find more law on this" and had "not located any appellate decision or any district court decision that has applied the arbitrary-and-capricious theory to a term of years." (*Id.* at 104–05).

(quoting *United States v. Jones,* 950 F.2d 1309, 1317 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992)). *See also Rummel v. Estelle,* 445 U.S. 263, 274, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980) ("[T]he length of the sentence actually imposed is purely a matter of legislative prerogative.").

Further, assuming arguendo that the arbitrary and capricious analysis applies here, the Court cannot find that the sentence imposed was arbitrary and capricious "as applied" to the Defendant. The *Walls* case is limited to its facts, and the Defendant makes no argument that the circumstances surrounding his arrest and conviction were similar to those of the *Walls* defendants, whose "underlying addiction drove these defendants' behavior" as drug "cookers" in the larger enterprise. *Walls,* 841 F.Supp. at 33.

Accordingly, at bottom, the Defendant's argument as to the statute "as applied" consists of a claim that the sentence imposed is disproportionate to the crime in view of the sentence he would have received for a cocaine powder offense, and in view of his "single prior criminal conviction." Defendant's Proposed Findings, at 56. As described above, however, the proportionality claim has already been rejected by the Court of Appeals for this Circuit. The Court thus finds no merit to the Defendant's Eighth Amendment challenge.

### III. THE COURT FINDS WITHOUT MERIT ALL THREE ARGUMENTS THE DEFENDANT SUBMITS PRO SE IN SUPPORT OF HIS CLAIM THAT HIS CONVICTION MUST BE OVERTURNED

Finally, the Court finds that the Defendant's *pro se* claims do not entitle him to any relief from the judgment of conviction or sentence received in this case.

**A. The Court finds no merit to the Defendant's argument that the jury was improperly instructed on an "aiding and abetting" theory, as the Defendant had ample notice of the**

**Government's pursuit of that theory and the Court has already found that there was sufficient evidence to support a conviction on that charge.**

First, the Defendant argues that his conviction is invalid because the jury was instructed on an "aiding and abetting" theory while "the aiding and abetting theory was not sufficiently presented at trial as part of the case that the prosecutor built upon." Facts and Findings of 2555 [sic] Motion, at 11.

The Court flatly rejects this claim. While an aiding and abetting theory may be given where the indictment does not even allege aiding and abetting, *United States v. Kegler,* 724 F.2d 190, 201 (D.C.Cir.1983), the indictment in the instant case did charge aiding and abetting, 18 U.S.C. § 2, and the Government requested an instruction on aiding and abetting in its written jury instructions filed months before trial.[13] Thus, the Court determines that the Defendant had more than adequate notice of the Government's theory and was in no way prejudiced by it.

In addition, the Court observes that it has already determined through careful analysis of the record and the relevant law that "there [was] ample evidence from which the jury could find beyond a reasonable doubt that Edmonds aided and abetted the distribution of the drugs." *Edmonds,* 765 F.Supp. at 1117. Indeed, the Court reached this conclusion "[e]ven assuming that the jury did not credit Harrison's claim that Edmonds provided the drugs...." *Id.* at 1118. Accordingly, the Court finds the Defendant's claim that the jury was improperly instructed on an aiding and abetting theory wholly without merit.

**B. The Court rejects the Defendant's claim that false testimony was given to secure an indictment because the Defendant has not proven perjury and there was sufficient competent evidence before the grand jury.**

Second, the Defendant argues that he is entitled to a new trial because the indictment was based upon the allegedly per-

---

**13.** Of course, the jury was also ultimately instructed on aiding and abetting. Final Jury Instructions, filed May 7, 1991, at 21–22.

jured testimony of Agent Gary Davis. In particular, the Defendant contends, "[i]n short, [that] Agent Davis' testimony that Harrison and Morse left his vehicle and 'met up with Edmonds,' and then came back to his vehicle with the drugs[,] is perjury, based on DEA surveillance testimony at trial." [14] Facts and Findings, at 15. Again, the Court finds no merit to this argument.

The " 'dismissal of an indictment is only required in extreme situations, as where the prosecutor knowingly presents perjured testimony.' " *U.S. v. Treadwell*, 594 F.Supp. 831, 835 (D.D.C.1984), *aff'd.*, 760 F.2d 327 (D.C.Cir.1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986) (quoting *United States v. Tham*, 665 F.2d 855, 863 (9th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 466 (1982)). However, "[t]he grand jury can act on testimony which in a trial would be incompetent evidence." *Id.* "Thus, even assuming, arguendo, that the witness ... committed perjury before the Grand Jury, the indictment must be sustained if there was sufficient competent evidence before the Grand Jury." *Coppedge v. United States*, 311 F.2d 128, 131–32 (D.C.Cir.1962), *cert. denied*, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed.2d 701 (1963). "Finally on this point, 'so long as the Grand Jury itself is not "tainted" in the sense that it was improperly constituted, or that its members were necessarily biased, its actions, if valid on their face, are valid.' " *Treadwell*, 594 F.Supp. at 831 (quoting *Coppedge*, 311 F.2d at 134).

Application of these principles to the instant case reveals that the Defendant's claim lacks any merit. First, the Defendant has made no allegation that the grand jury itself was tainted. Second, the Court cannot find that Agent Davis' testimony was perjurious [15] or, in turn, that the prosecutor knowingly presented perjured testimony to the grand

jury. *See Treadwell*, 594 F.Supp. at 835. Moreover, the Defendant was not prejudiced by Agent Davis' statements before the grand jury, as he had ample opportunity through counsel at trial to cross-examine Agent Davis thoroughly on any perceived inconsistencies in his testimony. Third, even if the testimony were proven to be perjury, the Court has reviewed the transcript of the grand jury testimony and finds that there was more than sufficient competent evidence before the grand jury to sustain the indictment. "It is enough ... that there is some competent evidence to sustain the charge issued by the Grand Jury even though other evidence before it is incompetent or irrelevant in an evidentiary sense or even false." *Coppedge*, 311 F.2d at 132.

## C. The Defendant's claim that his trial counsel was ineffective must fail because the challenged conduct of his counsel was objectively reasonable and passes the *Strickland* test.

 Finally, the Defendant claims that his trial counsel was ineffective for entering into a prejudicial stipulation concerning the chain of custody of the narcotics. The Court cannot agree.

The appropriate standard for review to determine whether counsel was effective was put forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Defendant must identify the conduct of counsel "that is alleged not to have been the result of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. In determining whether the conduct was indeed unreasonable, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular

---

14. The transcript of the proceedings before the grand jury was turned over to the defense as "Jencks" material during the trial. (Grand Jury Tr., Feb. 1, 1990).

15. The Defendant's claim seems to rest on the conclusion that the grand jury was misled into believing that the Defendant supplied Morse with the drugs. Agent Davis did not testify to that effect before the grand jury. Agent Davis stated

only that "Morse and Harrison met up with Edmonds," and that DEA surveillance followed Morse and Harrison back to Agent Davis' vehicle (where Morse produced the drugs). (Grand Jury Tr., Feb. 1, 1990, at 7). There is no evidence whatsoever that Agent Davis' statements constitute false testimony given with the willful intent to lie. *Dunnigan*, ——— U.S. at ———, 113 S.Ct. at 1116.

case, viewed as of the time of counsel's conduct." *Id.* at 689, 690, 104 S.Ct. at 2065, 2066. Furthermore, even if counsel's conduct is deemed to have been professionally unreasonable, if such error had no effect on the judgment, the judgment should not be vacated. *Id.* at 691, 104 S.Ct. at 2066.

 The Defendant alleges that his counsel at the second trial, Mr. Douglas, committed error in allegedly inducing the Defendant to sign a chemist stipulation that was against the Defendant's interests.[16] Under *Strickland,* the Court is to determine the reasonableness of Mr. Douglas's conduct in light of the circumstances, "applying a heavy measure of deference to counsel's judgments." *Id.* at 691, 104 S.Ct. at 2066. Upon review of the wording of the chemist stipulation that was entered into evidence, the Court finds that the stipulation merely established the chain of custody of the drugs. Such a stipulation is hardly outside prevailing professional norms and is designed to foster efficiency. In this case, it did not in any way go against the Defendant's interests with respect to any disputed element of the charges.

Accordingly, because the Defendant cannot pass the first prong of the *Strickland* test, *i.e.,* by showing that Mr. Douglas's conduct was unreasonable, the Court need not consider whether the attorney's conduct prejudiced the Defendant by affecting the judgment of the jury. In light of the above, the Court summarily rejects the Defendant's claim that his Sixth Amendment right was violated because he was denied effective assistance of counsel.

### CONCLUSION

The Court finds that the Defendant's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 shall be denied, as the Defendant's five claims, filed through counsel and *pro se,* must fail on the merits.

The Court shall issue an Order of even date herewith consistent with the foregoing Memorandum Opinion.

---

16. The stipulation read as follows:

Counsel agree that the drugs contained in Government's Exhibit No. 3 are the same drugs which Anthony Morse handed to DEA Agent Gary Davis on August 29, 1990.

Counsel also agree that Government's Exhibit No. 3 has been analyzed by the Drug Enforcement Administration, and that the substance contained in Government's Exhibit No. 3 is in fact cocaine base, and that the amount is 81.62 grams, the amount shown on Government's Exhibit No. 4.

Counsel also agree that Government's Exhibit No. 4 is a true and accurate chemical analysis of the substance contained in Government's Exhibit No. 3.

